IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JEFFREY TINGLER,

        Plaintiff,

      v.                                     Civil Action No. 3:07-CV-111

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.    <u>Background</u>

      Plaintiff, Jeffrey Tingler, (Claimant), filed his Complaint on August 21, 2007, seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on

December 20, 2007.[2]  Claimant filed his Motion for Summary Judgment on April 30, 2008.[3]

Commissioner filed his Motion for Summary Judgment on May 29, 2008.[4]

---

[1] Docket No. 1.

[2] Docket No. 5.

[3] Docket No. 14.

[4] Docket No. 15.

B.      The Pleadings

        1.      Plaintiff's Brief in Support of Motion for Summary Judgment.

        2.      Defendant's Brief in Support of Motion for Summary Judgment.

C.      Recommendation

        I recommend that:

        1.      Claimant's Motion for Summary Judgment be DENIED and this action be

remanded to the ALJ to determine:  1)  Whether any of claimant's three I.Q. tests were valid and

if so, why, and if not, why not; 2) Whether any valid IQ test of Claimant taken after age 22, and

other evidence of record, demonstrate or support the onset of the impairment before age 22; and

3) If the ALJ finds the onset of the impairment before age 22, then whether claimant met listing

12.05(C) and if so, why, and if not, why not.

        2.      Commissioner's Motion for Summary Judgment be DENIED for the same

reasons set forth above.

## II.  Facts

A.      Procedural History

         Claimant filed his first application for Social Security Disability Insurance Benefits and

Supplemental Security Income on January 31, 2000, alleging disability since December 30, 1996

due to lower back pain.  (Tr. 49).  The application was denied on July 13, 2001 and appealed to

the Appeals Council.  (Tr. 12).  The Appeals Council denied Claimant's Request for Review of

this decision on September 6, 2002.  (Tr. 6).

        On September 19, 2001, Claimant filed a second application for SSI benefits only.

While this second claim was pending before the Appeals Council, Claimant filed a civil action

on November 8, 2002 based upon the unfavorable ruling on his initial claim. On January 15, 2004, The United States District Court for the Northern District of West Virginia issued an order remanding the July 2001 decision by the ALJ for a new hearing. (Tr. 524). In the meantime, Claimant's second application was denied on March 25, 2003 and also appealed to the Appeals Council. (Tr. 485). The Appeals Council consolidated the remanded case with the second claim still pending its Request for Review, and remanded the entire claim back to the ALJ for a new hearing. (Tr. 538). A hearing was held before the ALJ on December 9, 2004. (Tr. 406). On February 24, 2005, the ALJ issued a decision adverse to Claimant. (Tr. 383). Claimant requested review by the Appeals Council which was denied on June 20, 2007. Having exhausted his administrative remedies, Claimant filed this action, which proceeded as set forth above.

B.     Personal History

Claimant was 43 years old on the date of the December 9, 2004 hearing before the ALJ. Claimant completed high school and has prior work experience as a general laborer including painting and performing minor mechanical work such as changing tires and brakes. (Tr. 937-38). Claimant has also worked in landscaping, mowing grass and mulching. Claimant has been a bus boy and a grocer. (Tr. 704).

C.     Medical History

The following medical evidence is the only medical evidence relevant to the only claim raised:   whether claimant met listing 12.05:

**Saint Joseph's Hospital, 12/30/00-12/31/01 (Tr. 253)**
Claimant admitted to ER for Multiple Substance Abuse and Depression.  Left AMA.

**Morgan D. Morgan, M.A., Intellectual Assessment and Mental Status Exam, 4/20/01(Tr. 303)**
Mental Treatment History

The Claimant indicated that he admitted himself to St. Joseph's Hospital in Buckhannon earlier in 2001 for alcohol dependence. The Claimant indicated that he has had a past history of attending AA on an irregular basis and has also received drug and alcohol counseling through the United Summit Center.

Substance Abuse History
The Claimant reported a lengthy history of alcohol abuse since his teenage years. He reportedly abuses beer and wine. In the past, he had reportedly used alcohol on a daily basis and reported some symptoms of withdrawal. He admitted drinking in the mornings upon occasions. The Claimant indicated that he had had some beer this morning, but did not appear intoxicated. He reported that during the 1980s he frequently abused marijuana, but denied any current marijuana usage. He reported a 1995 DUI and a public intoxication arrest during the 1980s.

Mental Status Examination
The Claimant arrived for his appointment casually attired, displaying fair hygiene and grooming. He tended to put forth a limited amount of effort and did not appear motivated. He made only fair eye contact, but was spontaneous. The length and depth of his verbal responses were within normal limits. He appeared extroverted. His speech was both relevant and coherent and of a normal pace. He was oriented to time, name, place, and date. His affect was generally restricted, but he did display some sense of humor. He denied any formal thought disorder, and no symptoms were observed. He denied any past suicide attempts or current plan of suicide. His concentration was mildly deficient.

Test Results and Impressions
WAIS-3
Verbal IQ: 69
Performance IQ: 79
Full Scale IQ: 72
Verbal Comprehension Index: 72
Perceptual Organization Index: 86

Verbal Subtests
      Vocabulary: 6
      Similarities: 4
      Arithmetic: 3
      Digit Span: 6
      Information: 5
      Comprehension: 5
      Verbal Mean: 4.83

Performance Subtests
      Picture Completion: 11
      Digit Symbol: 4
      Block Design: 6

Matrix Reasoning: 6
Picture Arrangement: 7
Performance Mean: 6.8

Discussion: The Claimant put forth a very limited amount of effort and did not appear motivated. He would constantly report that he was unable to do tasks due to poor concentration from his back pain. It seemed somewhat apparent to this evaluation that his lack of effort was more due to personality issues. This evaluation does not appear internally valid, and external factors indicate that the client's functioning is likely to be near the average range of intelligence.

WRAT-3
Subject:
Reading: Standard Score - 77; Grade Score - 6
Spelling: Standard Score - 66; Grade Score - 4
Arithmetic: Standard Score - 69; Grade Score - 4

Discussion: This does not appear to be an accurate depiction of the Claimant's true academic functioning. It is likely that the Claimant's academic functioning is within at least the high borderline to the low average range. His efforts appeared often quite limited, and he would discontinue activities and complain that he couldn't go ahead because of his back pain.
Diagnosis
    Axis I: 307.89 Pain disorder associated with both psychological factors and a general medical condition; 303.9 Alcohol dependence, with physiological dependence; 305.2 Cannabis abuse (by history).
    Axis II: 301.9 Personality disorder, NOS.
    Axis III: Reported severe back pain, upset stomach, allergic to "muscle relaxant."

Capability to Manage Finances
The Claimant's ability to appropriately manage his own finances would be limited by his history of alcohol and substance abuse.

**Braxton County Schools, CTBS Testing. 10/76, 10/78, 4/80 (Tr. 566)**
Age 14 - Verbal abilities in 8th national percentile and stanine scores ranging from 2-4
Age 16 - Verbal abilities in 5th national percentile and stanine scores ranging from 2-4
Age 17 - Language Grade Equivalency 2nd-9th grade
        Mathematics Grade Equivalency 5th-9th grade

**Braxton County Schools, Stanford Testing, 6/5/69, 6/4/70, 3/71 (Tr. 568)**
Grade Equivalency Scores:
        2nd Grade, 6/5/1969, GE 1.3
        2nd Grade, 6/4/1970, GE 2.0
        3rd Grade, 3/1971, GE 2.0

**Braxton County Schools, Slosson Testing, 9/9/70 (Tr. 568)**

IQ: 71

**Brenda Hinkle, MA, under the supervision of Robert J. Klein, Ed.D, Psychological Testing and Mental Status Examination, 7/28/04(Tr. 570 )**

Substance Abuse History:

Claimant reports drinking two or three to six 12-ounce beers twice a week. Ten years ago, he drank more heavily consisting of drinking liquor on a daily basis. He denied any symptoms associated with past or present alcohol dependence or abuse. He last utilized marijuana approximately ten years ago. He utilized cocaine a couple of times approximately ten years ago. He had one Driving Under the Influence charge approximately ten years ago. He reports no inpatient substance abuse treatment; however an initial assessment report by Olga Gioulis reports that he was hospitalized for three days in January 2001 at St. Joseph's Hospital due to alcohol and depression. He attended AA meetings and group therapy as required to obtain his driver's license after getting a DUI charge.

Educational Background:

He "was passed along through school" and received his high school diploma. He received poor grades throughout school. He never participated in special education classes. He repeated the 2nd grade. He is able to read and write. No vocational training. No school detentions or suspensions. Throughout school, he played football, basketball, track, and baseball.

Test Results and Impressions

WAIS-3

Verbal IQ: 69

Performance IQ: 72

Full Scale IQ: 68

Verbal Comprehension Index: 74

Perceptual Organization Index: 72

Working Memory: 73

Verbal Subtests

      Vocabulary: 5

      Similarities: 7

      Arithmetic: 5

      Digit Span: 6

      Information: 4

      Comprehension: 3

      Letter-Number Sequencing: 6

      Verbal Mean: 5.14

Performance Subtests

      Picture Completion: 6

      Digit Symbol: 5

      Block Design: 6

Matrix Reasoning: 4
Picture Arrangement: 6
Performance Mean: 5.40

Discussion: WAIS-3 scores are valid due to both internal and external factors. He completed high school; however, he reports that he was passed through school with poor grades, repeated the second grade, and worked as a general laborer his entire vocational career. Although he appeared in a great deal of pain, he did not give up easily and persevered well on tasks. Effort was good.

WRAT-3
Subject:
Reading: Standard Score - 81; Grade Score - 8
Spelling: Standard Score - 64; Grade Score - 4
Arithmetic: Standard Score - 74; Grade Score - 5

Discussion: WRAT-3 scores are valid due to the same reasons WAIS-3 scores are valid.

Diagnosis
Axis I: 309.0 Adjustment Disorder with Depressed Mood; 303.9 Alcohol dependence, without physiological dependence, sustained full remission.
Axis II: 317 Mild mental retardation (provisional)
Axis III: Back pain by self-report.

Diagnostic Rationale: A diagnosis of Mild Mental Retardation (provisional) is given due to valid IQ scores (V70, P72, FS68) obtained on today's date with functional limitations in functional skills, social/interpersonal skills, and work. Provisional diagnosis is given due to no previous psychological evaluation indicating onset prior to age 18.

Capability fo Manage Finances
No due to borderline intellectual functioning.

**Olga E. Gioulis, M.S., Update 12/19/03 (Tr. 607)**
Claimant has a history of alcohol problems and states that he is currently not abusing alcohol. He reports that he drinks one or two beers a week.

**Charles C. Weise, M.D., Psychiatric Evaluation and Psychological Testing, 6/27/02(Tr. 608)**
Psychiatric History
No documentation of treatment with psychotropic medications prior to early 2001.

Developmental History
Claimant stated he has "blocked out" much of his childhood years because of the various traumatic events. Her described himself as an angry child who "stayed in trouble." He thought

this was because of family problems.

Educational Background
Claimant stated he was promoted yearly "without learning anything." He received a high school diploma. He was involved in sports during his later school years.

Habits
Claimant was somewhat vague about his past history of alcohol abuse. He was charged with a DUI in 1995. There was also a hospital admission in 1996 because of alcohol related problems. He denied any organic complications of alcohol but admitted that there were family problems relating to his alcohol intake. At the present time he stated that he drinks on some occasions up to five cans of beer at a time. He gave a history of using marijuana during high school years but none in recent years.

Mental Status Examination
The examination revealed Claimant to be a well developed and nourished man. He did not appear to be confused and did not appear to have problems with either recent or remote past memory. He was not confused or disorganized in his thinking. He was competent to manage his financial affairs.

Psychologic Testing
His intellectual test scores were in the Borderline Range of intellectual functioning.

Diagnosis
| | | |
|---|---|---|
| Axis I Disorder: | 1) | Somatization Disorder, NOS |
| | 2) | History of alcohol abuse |
| | 3) | History of Psychologic factors affecting a medical condition |
| Axis II Disorders: | Test scores in the range of Borderline Intellectual Functioning | |
| Axis III Disorder: | History of 6/12/96 injury | |

**Candace Gardner Wright, M. Ed., Psychological Testing, 6/27/02(Tr. 613 )**
Behavioral Observations
The Claimant arrived on time for the scheduled appointment and was neatly dressed and physically clean. Mental status was clear for any confusion, disorientation, and/or thought disturbance. The Claimant repeated five digits forward and two in reverse. He recalled 4 out of 4 objects immediately and 2 out of 4 following a ten minute delay. Judgment was fair per hypothetical tests.

Test Results and Impressions
WAIS-3
Verbal IQ: 76
Performance IQ: 77
Full Scale IQ: 68

Classification: Borderline Range

Verbal Subtests
  Vocabulary: 7
  Similarities: 5
  Arithmetic: 5
  Digit Span: 5
  Information: 7
  Comprehension: 7

Performance Subtests
  Picture Completion: 11
  Digit Symbol-Coding: 3
  Block Design: 4
  Matrix Reasoning: 7
  Picture Arrangement: 7

Discussion: The Claimant was administered 11 subtests of the WAIS-3 from which his IQ scores were derived. His general cognitive ability is in the Borderline range of intellectual functioning. His overall thinking and reasoning abilities exceed those of approximately 5% of adults his age. There is a 95% chance that his true IQ score falls in the range 71-80. The Claimant may experience difficulty in keeping up with his peers in a wide variety of situations that require age-appropriate thinking and reasoning abilities. The present test results reflect a higher estimate of his intellectual abilities compared to the 2001 testing; however, the WAIS-3 FSIQ of 72 nonetheless falls in the 95% confidence interval of 71-80. The Claimant had difficulties adapting to the testing situation due to being pain absorbed. Consequently, the present test results may be a low result of his true intellectual potential.

WJ-3
Passage Comprehension: Standard Score - 95; Percentile - 37; GE - 8.9
Reading Vocabulary: Standard Score - 91; Percentile - 27; GE - 7.3
Reading Comprehension Cluster: Standard Score - 92; Percentile - 30; GE - 8.0

Discussion: Test date indicate that the Claimant has an 8th grade reading level which is fairly commensurate with his history of completing high school with what he described as several years of underachievement. The Claimant's 8th grade reading level is higher than that which one would expect for an individual with the ability level obtained on the WAIS-3.


**Olga E. Gioulis, M.S., Update 8/19/04-10/26/04 (Tr. 618)**
Claimant is estimated to be functioning in the Average Range of intellectual abilities.

**L. Leon Reid, Ph.D., Report 11/15/2004 (Tr. 634)**
Claimant's **MAJOR PROBLEM** is that of Substance Addiction Disorder. Claimant's

intelligence estimates have been from Mild Mental Retardation to near average. He functions at the Borderline IQ.

**Olga E. Gioulis, M.S., Initial Assessment and Evaluation 2/14/01-5/23/01 (Tr. 766)**
Mental Status
Claimant admits to an alcohol problem and to a desire to work on this. Based on self reports he may have a learning problem.

Diagnostic Impression:

| | |
|---|---|
| Axis I: | 293.83 Mood Disorder Due to Medical Condition (pain) versus 309.0 Adjustment Disorder w/ Depression Mood 305.0 Alcohol Abuse, Early Partial Remission |
| Axis II: | V71.09 None |
| Axis III: | Back injury and chronic pain |
| Axis IV: | Work related injury, hx family abuse and alcoholism, relational problems |

**Gale Thompson, M.A., Supervised Psychologist, OASIS, Psychological Evaluation(Tr. 922)**
Current Functioning
Claimant admits a history of alcohol abuse when he was young but now only drinks an occasional beer. He denies the use of illicit drugs.

Behavioral Observations and Mental Status Exam
Claimant appears to function in the average intellectual range of general intellectual capabilities.

D.    Testimonial Evidence

Testimony was taken at hearings held on the following dates: February 21, 2001;

November 13, 2002; and December 9, 2004. The following portions of the testimony are

relevant to the disposition of the case.

February 21, 2001

[EXAMINATION OF CLAIMANT BY ALJ] (Tr. 450)

Q    Now, as, as far as chores around the house, did you, you help, help, you know,

chip-in and - -

A    Cooking - -

Q    Cooking?

10

A Because I could, when I wanted to sit down, I was able to, to sit down if I have to.

Q Yeah.

A So I did most of the cooking.

Q So you, you, you couldn't do any, any, anything before?  What, what, what, what, what you did some cooking?  Is that what?

A The cooking's the only thing I done, yeah.

*  *  *

Q How, how far did you go in school?

A The 12th grade.

Q Yeah.  Now, do you have any particular problems, you know, reading, doing arithmetic?  Those kinds of things.

A I'm not very good at it.

Q Yeah.

A The reading.

Q How, how, how, how did you do in school when you were going to school?  Not too good?

A Not so good.  Unh-uh.

Q You understand the work.

A What's that?

Q Would you, did you understand the school work when, when you were - -

A Yeah, I just had a hard time.  My dad just, I didn't care too much about it when I went to school.  My dad - -

Q     Yeah.

A     I had a pretty rough time with my dad.

Q     Were, were you in regular classes or, you know, or special ed. classes or - -

A     No.

Q     The regular classes.

A     Regular classes.

Q     And did you ever get held, held back?

A     Once.

Q     One.  One time.

A     Yeah.

Q     Now, as far as say, reading simple things, could, could, could you read, you

      know,

a simple list of groceries say?

A     It's a - -

Q     Yeah.

A     Uh-huh.

Q     Do you do much reading at all?  I, you know, [inaudible] novels - -

A     No.

Q     Or newspapers or - -

A     I, I read through the newspapers.

                          *        *        *

November 13, 2002

                              12

Q       And how far did you go in school?

A       Twelfth.

Q       Did you graduate?

A       I graduated.

                         *       *       *

Q       Let's talk about what a typical day is like for you.  What time do you usually go to

bed at night?

A       Between 10:00, 11:00 o'clock.

Q       And what time do you get up in the morning?

A       The way I sleep I usually get up in the morning, my daughter she goes off to

school, that's about 7:30 and then I lay back down and I sleep until about anywhere from 10:30

to 11:00 because that's when I get most of my sleep because I don't sleep during the night, I

might get a couple hours of sleep in.

Q       And do you get that couple hours - - are you talking from 10:00 or 11:00 when

you go to bed until your daughter goes to school at 7:30 in the morning?

A       Uh-huh.

Q       Do you get that couple hours solid?

A       In the morning after she goes off to school that's when I get my best sleep.

Q       What about over the night?

A       I just toss and turn most of the night.

Q    Now, when you get up at 7:30 do you get up and get her off to school?

A    No.

Q    What do you do?

A    I don't do anything, I just lay there, she just hollers at me.  I pick her up at the school bus.  She just hollers at me and tells me not to forget her.

Q    Okay.  You pick her up at the school bus in the afternoon?

A    Uh-huh.

                    *         *         *

Q    Once you get up and get dressed and you kind of get up moving around what time is it?

A    It's usually around 11:00 or noon before I get up moving around.

Q    And how do you - - do you fix yourself breakfast?

A    No, I hardly ever eat breakfast.

Q    What about lunch?

A    I hardly ever eat lunch either unless I just grab an apple or something.

Q    Now, what time do you pick your daughter up from school?

A    About 3:30.

Q    What do you do between 11:00 and 12:00 and you get up moving around at 3:30?

A    I don't do a whole lot of anything.  I usually go and visit my brother.

Q    And how far away is your brother?

A    It's probably I'd say a 20 minute drive.

Q    And what do you do when you're at your brother's house?

A  We just kind of sit around.  He's not working.  We watch a little TV.

*  *  *

Q  Do you do any of the - - what do you do around your house, are you able to do any

of the chores?

A  I don't do anything.  I mean, my daughter she'll do, she does - - they know my

back is hurt so they do everything.

Q  Are you able to like help with the laundry or dishes or anything like that?

A  I don't do anything.

Q  What about cooking?

A  I used to do it but I don't even do it now.

Q  How long has it been since you use to do the cooking?

A  The last time I was up here I was cooking and doing a little bit of stuff around the

house but now I ain't doing anything.

*  *  *

Q  Do you currently drink?

A  I drink maybe once or twice a week.

Q  How much?

A  It's just a couple beers a day because on the medication I take I ain't supposed to

drink.

*  *  *

[EXAMINATION OF MEDICAL EXPERT BY ALJ] (Tr. 953)

Q        And based on your review, what mental health diagnosis or diagnoses do you find supported by the evidence in the file?

A        Okay.  This gentleman has had a diagnosis of depression and also the alcoholic diagnosis.  And he is borderline to below average intelligence.

Q        All right.  Now what are the IQ numbers, did you see those, are they somewhere?

A        They're here, yeah, in March of 2002 that's Exhibit B2F, the full scale IQ is 72, which is borderline.  That's the only one in evidence, Your Honor.

Q        No verbal in performance?

A        Oh, yeah, the verbal is 69, the performance is 79, full scale 72.

Q        All right.  Is there - - now you're familiar with listing 12.05?

A        I am, Your Honor.

Q        IQ's from 60 to 70 that arrive in the developmental period, i.e. prior to age 22.  Is there any way to tell whether this claimant had these IQ's prior to age 22 or with substantial alcohol use over a period of years would that enter into the picture at all?

A        The fact that he graduated from high school, we do not have the high school or school records.  But we would assume that it would be more or less the average range.  The alcohol of course could decrease intelligence if there was any great amounts over a period of 10 or more years.

Q        Now, does any of these impairments meet any listings, any of the mental listings?

A        They do not, Your Honor.

                    *        *        *

December 9, 2004

[EXAMINATION OF MEDICAL EXPERT BY ALJ] (Tr. 412)

Q      All right.  Now, alcohol or substance, other substance abuse, do you feel that that is a material factor in determining disability in this case?

A      I believe it is, Your Honor.

Q      You believe that the claimant's usage of alcohol and other substances would prevent him from performing substantial gainful activity?

A      It would.

Q      As of when?  When he first began abusing in his teenage years?

A      Right.  He indicated that he had been a heavy drinker since that time.  And since he's had off and on kinds of things, but what he had in his adult life is Oxycontin and other drugs, along with alcohol, and sometimes other drugs.  And that causes you to, of course, be very dependent in the use of those substances for whatever reason.

Q      Did you feel the evidence, the record that you reviewed indicated that his condition is in substantial remission at this point?

A      I don't, I do not believe so.

*      *      *

[EXAMINATION OF MEDICAL EXPERT BY ATTORNEY] (Tr. 413)

Q      The record shows from my reading that Mr. Tingler's alcohol usage has decreased significantly over the last couple of years.  Is that your understanding?

A      That's true.

Q      Approximately two to six beers a week, I think, maybe twice a week, is that what's in the record at this point?

17

A       The evidence there is somewhat questionable.  He was given a [INAUDIBLE]

licensed psychologist Sutton on February 14 to May 23, 2001, indicated that he was in early

cross-over remission.  That's May 23, 2001.

Q       Huh-huh.

A       He has not really submitted to treatment for his alcoholism and drug abuse.  Like

        I

notice that on page 3, that I'm referring to on the bottom of the page, he went to St. Joseph's for

three days.  He left against medical advice

Q       Okay.  I'm also referring specifically to the period, to more recent times.  We

        have

a partial remission in 2001.  Is there, what evidence do you see, if any, of significant alcohol or

drug use since that mention of partial remission in '01?

A       Okay.  Brenda Hinkel [phonetic], a supervised psychologist, July 02, '04.

Q       Uh-huh.

A       It's Exhibit 20(f), that's page 4 in my report, indicated that he was drinking two

        or

three to six 12 ounce beers twice a week.

Q       Uh-huh.

A       And prior to that, he was drinking more heavily.

*       *       *

[EXAMINATION OF MEDICAL EXPERT BY ALJ] (Tr. 414)

Q       So that would be a maximum of 12 beers a week.  Would you consider that a

substantial alcohol abuse?

A       What we see with alcoholics and drug abuse people, Your Honor, the longer they
have done this and then when they slack off, it takes less beer or drugs to cause malfunction.
And I suspect this is the case here.  We see this commonly in the treatment of alcohol and drug
abuse individuals.

Q       In other words, your body is programmed to feel the effects of the substance?

A       Yes.  It takes only a couple of beers for some people to feel the effects of the
substance.

Q       Okay.

*       *       *

[EXAMINATION OF MEDICAL EXPERT BY ATTORNEY] (Tr. 415)

Q       So someone who has abused for a long period of time, you're saying that they
develop more sensitivity to it, rather than an immunity to it?

A       That's correct.

Q       What about drug use?  I don't see any indication of drug abuse.  Do you see any?

A       You mean in recent years?

Q       Uh-huh.  Illegal drug use?

A       He has a cannabis history according to Exhibit B2(f).

Q       Uh-huh.

A       The - -

ALJ:            [INAUDIBLE], I don't really see much evidence to substantiate it.

ATTY:         Right.  He clearly has a history.  There is no question there.  He has a

19

history of alcohol abuse and a fairly heavy alcohol abuse and the history of some drug use in the past.

*     *     *

Q      Now I also want to ask about IQ scores.  We have three separate IQ tests in this file, one in 2001, one in '02, and one in '04.  Your report doesn't talk about listing 12.05(c).  Each of those IQ scores have a score in the sixties.  In '01, we had verbal score of 69, performance of 79, full scale of 72.  In '02, we had a verbal of 76, a performance of 77, full scale of 68.  And in '04, 70, 72, and 68.  So each time we have an IQ score in the sixties.  The first two, there were questions about effort and questions about his alcohol use in it, whether it had any effect.  The last test said that this test was valid, that these are valid scores with a diagnosis of mild, mental retardation.  We also have school records in the file.  What is your opinion with regard to 12.05(c), given the consistency of these IQ scores and his school records?

A      Okay.  I would say this.  The first two records you referred to are basically not valid as far as giving a fairly true estimate of his intelligence.  Now [INAUDIBLE] diagnosis of July 28, 2004, Exhibit 20F, indicates the IQs you mentioned, but also he was reading at the eighth grade level.  If you have a really truly 68 IQ, you're not going to read at the eighth grade level, so there's a conflict there.  And this should have been explained by the psychologist, it if wasn't.  But in general, you don't find those people reading at the eighth grade level.  So there's fluctuation as to his mental ability therefore.

Q      So with a verbal IQ score of 70, you don't believe he's capable of reading on an eighth grade level?

A      No.

20

Q      So what is your opinion about 12.05(c)?

A      I don't believe he meets 12.05(c)

Q      When we look at these school records, what are their standardized testing scores? Are you familiar with, what are the national GR percentile?

A      The national, this is the percentile that's put in the database with people from all over the country that use that test. And it's recorded wherever it's recorded, Chicago, Princeton, or wherever it might be, dependent on who made the test or what company handles the test.

Q      And whose, his 1978 score shows a verbal score test at that time was a five?

ALJ:      '78?

ATTY:      1978

Q      National GR percentile of five, national stanine of two. What is the difference between a GR percentile and a stanine?

A      Basically those scores indicate that he was probably retarded and hit the performance of those tests.

Q      And would those tests be consistent with test results from all three of the tests that we have, which show IQ scores ranging from 68 to 79?

A      He should be, he should be higher on his scores if he has a 78 IQ. The 68, he probably was not functioning at as high a level as he should have.

Q      These are verbal scores that I'm looking at.

A      In 1978.

Q      In 1978, we have verbal national GR percentile of five, national stanine of two. We have verbal IQs of 69, 76 and 70.

A        Uh-huh

ALJ:        When?

ATTY:        1978.

ALJ:        Okay.

Q        Are those scores consistent?  Well, there's a range of error IQ scores, is that

correct?

A        Yes.

Q        Which generally is the range of error?

A        Well, it depends on the test.  But generally, 15 points.

Q        You have a, you have a standard of error of 15 points on an IQ test?

A        Uh-huh.

Q        So someone could - -

A        These are paper pencil tests.

Q        Right.

A        Not the Wechslers or the Binets, standard Binet.

Q        These are WAIS-R, I believe.

A        Is that WAIS-R?

Q        These are WAIS-R IQ tests, I believe.  I can look that up, but I think they are.

A        Okay.

Q        It's my understanding that the standard, the error on IQ tests was about three to

five points generally.

A        Three to give points in those cases.

Q        Is that on the Weiss R?

A        Yes.

Q        Okay.  Are the 1978 scores, on the national test, of the verbal national GR

percentile of five, and the national stanine of two, consistent with the IQ verbal IQ test scores

that he has had over the last four years: 69, 76 and 70?

A        I'm really not familiar with that report.

Q        The school record?

A        1978?  I don't have that in my record.

Q        You don't have - -

ATTY:        Show him the exhibit?

ALJ:        Yeah, let me see it too.

ATTY:        Sure, it's the school records that.  I don't have an exhibit number on them.


They're an E exhibit, I believe.

ALJ:        Yeah.

ATTY:        1976 test scores here and 1978.

ALJ:        Where are the IQ scores?

ATTY:        They are not IQ scores.  They are national standardized testing scores.

ALJ:        I understood you to say IQ scores in 1978.

ATTY:        No, they are national standard.  When I was asking about the - -

ALJ:        Well, what was the IQ score you were talking about?

ATTY:        The scores, these are the three tests that are in the file.

ALJ: Oh!

ATTY: 2001, 2002, 2004. 1978 is just a national, it's a test that they give kids every couple of years in school.

ALJ: [INAUDIBLE].

ATTY: And they - -

ALJ: Okay. Well, what kind of test is this? Who made this up? [INAUDIBLE] this information? Who produced the test? What are we - what type of test are we talking about? What's the name of it?

ATTY: I think it's the Stanford Nine, but I have to look at the [INAUDIBLE].

ALJ: I don't see that here. And -

ATTY: And I see those test scores, I mean, they are standardized tests that are given to students in like the third grade, sixth grade, ninth grade, eleventh grade, I believe, in schools.

[EXAMINATION OF MEDICAL EXPERT BY ALJ] (Tr. 421)

Q Well, what are these things like, it says here CAT, and it's got a list of the West Virginia map, and it says CTVS.

A CAV is California Achievement, Your Honor.

Q CAT, it says.

A CAT, yeah. Probably Achievement Test, in that case.

Q CTVS, is that [INAUDIBLE].

A Say that again?

Q CTVS?

A      CTVS?  I have to take a look at it.

Q      All right.  That's a good idea.  Okay.

ALJ:      And there's one in '76 and '78, I see that.

ATTY:      Yes, sir.  And the one I was looking at are the national, it has - -

ALJ:      [INAUDIBLE] - -

ATTY:      National stanine and national GR and national stanine.

Q      It's difficult for me to understand all these scores can vary so widely.  I'm just going to point this out, Doctor, and you can take a look at it.  But the verbal national GR in 1976 is eight, okay?  In 1978, it fell to five.  But here's the real surprising figure, the non-verbal GR in 1976 was seven.  In 1978, it was 35.  How can he have tested vary that wildly in two years?

A      Okay.  The CAT is the Cognitive Ability Test.  The, this was 1976 and his stanine was two.

Q      What is that, stanine?

A      There's nine points.  Stanine is nine points and each point is approximately 12 - -

Q      Percentiles?

A      Yeah.  So he's probably less than, he's probably around the 20th percentile in that particular test, both in the verbal and non-verbal aspects of the test.

Q      But if you look at the two years, '76 to '78, or are you just on '76 now?

A      I'm just on '76.

Q      Okay.

A      Okay.  '78, he was higher on the non-verbal.  He was probably, he was less than 50 percentile.  His figure was four.  Five would be 50 percentile.  So he was less than 50th

percentile, non-verbal.  But about 20th percentile in the verbal, which is the same in '76.

Q        Well, is there any, can you make any kind of correlation between those, that data and IQ scores?

A        The, what we see with children, Your Honor, is this can be a great amount of disparaging results from year to year, because of development factors, because of emotional factors whatever they might be in the home or whatever.  Now in '78, in '76, he was 11, he was in '76 he was sixteen.  And he said he started drinking when he was 16.  So in '78, he was drinking.

A        Yeah, according to his record.

Q        Could that have depressed his scores?

A        Certainly could have.  We don't know the, we don't have any evidence here. Okay '79 to '80, he was failing grades due to attendance policy, whatever that means.  But he was in football, basketball and track, '76 to '77.  Motor abilities must have bene okay.  Let's see, we have Stanford in here too.  69, that's when he was about eight years old.  In 1970, his chronological age was eight nine.  He was at the second grade level, so to speak.  So he's one grade at least behind the average.  He has this Lawson (phonetic) IQ in 1970 of 71.

Q        His Lawson IQ is?

A        His Lawson IQ is 80.  Individually administered test, it's more of, it's not as reliable as the Wechsler.

Q        What year was that?

A        1970.  September of 1970.

Q        [INAUDIBLE]?

26

A        9/9/1970.

Q        That would - -

A        The IQ was 71.

ATTY:        He would have been nine.

A        He would have been nine years old, yes.

Q        In 1970, nine years old.

A        In 1980, he was, in a class of 185, he was 181.  So he was almost four or five

from

the bottom.  It's like he was making passing grades though.  I would probably say that his school

record is below average as far as grades are concerned, in this report that I have before me.

There was a period from 1967 to '78, I believe.  Is that right?

ATTY:        Yes, sir.

Q        But it is the case, of course, it probably goes without saying, but I'll ask it

anyway,

a case of low grades don't necessary mean low cognitive ability.  You can have low grades for a

lot of reasons.

A        That's correct.

Q        Such as absenteeism, lack of interest, lack of desire.

A        Right.

[EXAMINATION OF MEDICAL EXPERT BY ATTORNEY] (Tr. 424)

Q        Here's my question here, Doctor, is that this, all of these scores seem consistent to

me.  But everything from the time he was a child through the last, through his teenage years,

through 2001 IQ scores, 2002 and 2004, they're all consistent, all showing significant problems. Scores varying from the high sixties to the low seventies.

ALJ:        Well, the only true IQ score we have for the school year is in '71.

ATTY:      First of all.

Q      Does the Lawson work on the same scale as the WAIS-R and the Wechsler and all

that?

A      It -

Q      Based on 115 [INAUDIBLE]?

A      Yes, the same classifications.  The Lawson tests, Your Honor, were revised by one of my doctoral students.

[EXAMINATION OF MEDICAL EXPERT BY ALJ] (Tr. 424)

Q      And, of course, a pattern of substance abuse, can that decrease your IQ?

A      Oh, yes.  Oh, yes.

Q      Significantly?

A      If you are heavy at it, yes.  And he was drinking heavy during his teenage years, according to his testimony in the record that I saw.

[EXAMINATION OF MEDICAL EXPERT BY ATTORNEY] (Tr. 425)

Q      But we don't have significantly decreased IQ scores, do we?

A      Well according to the reports that we have in recent years, Mr. Morgan indicated, I guess that he had a lack of effort and poor concentration.  He felt the IQ was average or near average.

[EXAMINATION OF MEDICAL EXPERT BY ALJ] (Tr. 425)

Q        I think what Ms. Carpenter is referring to is that we have what appears to be a 71 IQ in the school and that the later IQs after a period of presumed fairly heavy substance abuse, they're still in the low seventies.

A        Uh-huh.

Q        So, 70's plus - -

[EXAMINATION OF MEDICAL EXPERT BY ATTORNEY] (Tr. 425)

Q        [INAUDIBLE]?

A        Yes.

Q        And it doesn't appear to have occurred.  I mean, I understand that it can occur and it can cause significant decrease.  But it doesn't appear to have done that in this particular case. Because the '04 scores, the doctor says are valid.  And those are 70, 72 and 68.

[EXAMINATION OF MEDICAL EXPERT BY ALJ] (Tr. 426)

Q        Well, it's not a significant decrease.  What else, what else do you have here.

A        The only thing about the '74 is that he has a eighth grade reading level, which is the factor that's out of line with the IQ test scores.

[EXAMINATION OF MEDICAL EXPERT BY ATTORNEY] (Tr. 426)

Q        In the school tests that you, I assume that you had not reviewed those at the time you wrote your report?

A        Correct.

Q        Okay.  So does the review of the school records, with you know, with the IQ scores, the Lawson IQ, the Stanford scores, the national stanines, all the information in there,

does that change in any way, your opinion about his abilities, about the Part B criteria or your opinion about 12.05(c)?

[EXAMINATION OF MEDICAL EXPERT BY ALJ] (Tr. 426)

Q       Is there anything in the school records that changes your opinion, Doctor, about either, I'm not sure what, either 12.05(c)?

A       The only thing, let's take the Lawson IQ of 71. Now a person who has a 70 IQ, you probably wouldn't expect them to achieve academically beyond the sixth grade. I mean they all get through high school, of course, but the academic achievement would be at the sixth grade level, with effort and proper curriculum, tutoring and so forth. I think, and these people do poorly, of course, on national tests, paper/pencil tests. I would say it's a toss-up about 12.05(c), Your Honor. Like the Lawson standard deviation is about six to eight points, depending on age and grade. He can be considered meeting 12.05(c) as far as the IQ test, if you take the standard deviation variation in mind.

Q       I think that's been ruled against by the courts already, you're not allowed to take that possible error into account, to lower the IQ score [INAUDIBLE].

ATTY:       I'm not familiar with that case, Your Honor. Palms lets you do it.

ALJ:       Pardon?

ATTY:       Palms allows it.

Q       I noticed, Doctor, at least one decision that helps us. I don't have it - -

ATTY:       I was going to say, I know you don't know it off the top of your head, but I

would be very interested in knowing that case, because I am not familiar with it.

ALJ:        Okay.  Well, I'll try to dig it up if I can.

ATTY:      The only one I know is that, I know that Palms does permit it.  And I have that cited at the office, but I don't have it with me either.

A      I can't see anything else, Your Honor, from his school record here that would add to my testimony.

Q      Okay.

[EXAMINATION OF MEDICAL EXPERT BY ATTORNEY] (Tr. 427)

Q      So your testimony is that 12.05(c) is a toss-up?

A      Yes.

Q      Okay.

*      *      *

[EXAMINATION OF CLAIMANT BY ATTORNEY] (Tr. 428)

Q      And walking?

A      About 20 minutes.

Q      Do you walk for exercise?

A      Yes, I do.

Q      You walk every day?

A      I try to walk every day.

*      *      *

[EXAMINATION OF CLAIMANT BY ATTORNEY] (Tr. 439)

Q      Now I want to ask you about your alcohol use.

A      Uh-huh.

Q       How much do you drink now?

A       I might drink four or five beers a week in a normal.

Q       How big of a beer?

A       It's just a 12 ounce can.

Q       In a week?

A       Yes, ma'am.

Q       Do you have binges where you drink more than that?

A       No.  I might drink one or two on the weekend, watching a football game or a basketball game.

Q       Do you drink anything but beer?

A       No.

Q       No whiskey?

A       No whiskey, no nothing.

Q       How about drugs?

A       No, ma'am.

Q       No marijuana?

A       No.

Q       Cocaine?

A       No.

Q       For how long?

A       Oh I ain't done that for years.

Q       When you drink, do you get drunk?

A      No, I don't.

Q      Do you feel impaired?

A      No.

Q      How many beers do you drink at a time, generally?

A      No more than four.

Q      And given your history, you know what it feels like to be impaired?

A      Yes, I do.


E.      <u>Lifestyle Evidence</u>

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

Walks for exercise about twenty minutes everyday.  (Tr. 431)

Drinks four or five beers a week.  (Tr. 439)

Drinks no more than four beers at a time (Tr. 440).

Did most of the cooking for his wife and daughter.  (Tr. 454)

Reads through the newspapers.  (Tr. 458)

Goes to bed between 10:00, 11:00 o'clock.  (Tr. 940)

Wakes up at 7:30 A.M. when daughter goes off to school. (Tr. 940)

Goes back to sleep until anywhere from 10:30 to 11:00 A.M. (Tr. 940)

Usually goes and visits his brother and watches TV.  (Tr. 942)

Picks up daughter from school at 3:30 P.M.  (Tr. 942)

Drives to get mail at his post office box.  (Tr. 947)

### III.  The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence.  The Court has construed Claimant's brief to allege three instances of error on the ALJ's part: 1) the ALJ incorrectly ruled  that the "prior to age 22" component of Listing 12.05 was not met because there were no formal IQ tests administered prior to age 22; 2) the ALJ incorrectly determined that the Claimant's IQ scores were effected by his past history of substance abuse; and 3) the ALJ erred in invalidating the medical expert's testimony that Listing 12.05(C) was a "toss-up" due to the fact that he was "badgered" by counsel.

Commissioner maintains that the ALJ's decision that the Claimant did not meet the requirements of Listing 12.05 is supported by substantial evidence and should therefore be affirmed. Specifically, Commissioner responds  that 1) the ALJ, in considering the school records, properly concluded that they were insufficient to establish mental retardation under Listing 12.05; 2) the Plaintiff  failed to show evidence proving Claimant's IQ scores were unaffected by past history of substance abuse; and 3) the ALJ is empowered to decide factual issues and as such, his invalidation of the medical expert's testimony that Listing 12.05(C) was a "toss-up" was proper.

B.    The Standards.

1.    Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial

burden of showing the absence of any issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  <u>Matsushita Elec.  Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v.  Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

        2.      <u>Judicial Review</u>.  Only a final determination of the Commissioner may receive judicial review.  <u>See</u>, 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

        3.      <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

        4.      <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

        5.      <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42

U.S.C. §§ 416(I), 423©; <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.    <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.    <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.    <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.    <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing

any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  <u>Rhoderick v. Heckler</u>, 737 F.2d 714-15 (7th Cir. 1984).

10.    <u>Social Security - Substantial Evidence - Listed Impairment</u>.  In order for the reviewing court to determine if the Secretary based the agency's decision on substantial evidence, the decision must include the reasons for the determination that the impairment does not meet or equal a listed impairment.  <u>Cook v. Heckler</u>, 783 F.2d 1168, 1172 (4th Cir. 1986). The ALJ must identify the standard to be applied.  <u>Id</u>. At 1173.  The ALJ should compare each of the listed criteria to the evidence of Claimant's symptoms and explore all relevant facts.  <u>Id</u>.

11.    <u>Social Security - Mental Impairment and Development of the Record</u>.  The pertinent inquiry is "whether the record contained sufficient medical evidence for the ALJ to make an informed decision as to alleged mental impairments."  <u>Matthews v. Bowen</u>, 879 F.2d 422, 424 (8th Cir. 1989).  The Commissioner is responsible for making the determination whether a claimant meets the statutory definition of disability.  20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).  No special significance will be given to the source of an opinion on issues reserved to the Commissioner.  20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3).

12.    <u>Social Security - Non-treating physician</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence.  <u>Hayes</u>, 907 F.2d at1456.  The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law is applied, not to substitute the

Court's judgment for that of the Commissioner.  Id.

13.  <u>Social Security - Mental Disorders - Supported by Medical Evidence</u>.  The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment(s) as well as consideration of the degree of limitation such impairment(s) may impose on the individual's ability to work and whether these limitations have lasted or are expected to last for a continuous period of at least 12 months.  20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 12.00.

14.  <u>ALJ's Duty to Inquire Into the Evidence</u>.  "[T]he ALJ has a duty to explore all relevant facts and to inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate."  <u>Walker v. Harris</u>, 642 F.2d 712, 714 (4th Cir. 1981).  <u>See also</u> <u>Cook v. Heckler</u>, 783 F.2d 1168 (4th Cir. 1986).  When failure to inquire into the additional evidence is prejudicial to the Claimant then the case should be remanded.  <u>Marsh v. Harris</u>, 632, F.2d 296, 300 (4th Cir. 1980).

15.  <u>Mental Disorders</u>.  The evaluation of disability on the basis of a mental disorder requires the documentation of a medically determinable impairment(s) as well as consideration of the degree of limitation such impairment(s) may impose on the individual's ability to work and whether these limitations have lasted or are expected to last for a continuous period of at least 12 months.  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00.

16.  <u>Social Security - Severe Impairment</u>.  An impairment is severe when, whether by itself or in combination with other impairments, it significantly limits a claimant's physical or mental abilities to perform basic work activities.  20 C.F.R. §§ 404.1520(c), 404.1521(a),

416.920(c), 416.921(a).  See also Byrd v. Apfel, No. 98-1781, slip op. at 2 (4th Cir. Dec. 31, 1998);[1] Social Security Ruling 85-28.

17.     Social Security - Listing.  The ALJ must fully analyze whether a Claimant's impairment meets or equals a "Listing" where there is factual support that a listing could be met. Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986).  Cook "does not establish an inflexible rule requiring an exhaustive point-by-point discussion in all cases."  Russell v. Chater, No. 94-2371 (4th Cir. July 7, 1995) (unpublished).[2]  In determining disability, the ALJ is required to determine whether claimant's condition is medically equal in severity to a listing.  20 C.F.R. §§ 404.1529(d)(3), 416.929(d)(3).  The ALJ is required to explain his findings at each step of the evaluation process so that the reviewing court can make determinations on whether his decision is supported by substantial evidence.  Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984).  See also Myers v. Califano, 611 F.2d 980, 983 (4th Cir. 1980).

C.     Discussion

1.     Failure to Find that Claimant Met the Requirements of Listing 12.05

Claimant contends that the ALJ erred because he failed to find that Claimant met the requirements of Listing 12.05.  Commissioner countered that the ALJ properly found that Claimant has not shown that he meets the requirements for disability.

---

[1] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in this regard.

[2] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in this regard.

It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner. Id.

The issue is whether there is substantial evidence to support the ALJ's finding that Claimant did not meet the listed impairment for mental retardation. The listing of 12.05 of 20 C.F.R. Part 404 Subpt. P., Appendix 1 is as follows:

> Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period; i.e., the evidence demonstrates or supports the onset of the impairment before age 22...

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

> . . .

> C. A valid verbal, performance, or full scale IQ of 60 to 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function...

Moreover, 20 C.F.R. Part 404 Subpt. P., App. 1 §12.00(D)(6)(c) provides, in relevant part:

> ...In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05.[3]

It is clear that § 12.05 imposes a three-part test; all three elements must be met in order

---

[3] See also Kennedy v. Heckler, 739 F.2d 168 (4th Cir. 1984)(the regulations mandate when a single IQ test produces multiple scores, the lowest score is to be used in conjunction with §12.05).

for a claimant to satisfy the requirements of Listing 12.05 and be considered mentally retarded. First, the Claimant must show "onset of the impairment before age 22." Part two is a two-prong test requiring a valid IQ score of between 60 and 70 and a physical or other impairment imposing additional and significant work-related limitation of function. "Alongside the two requirements in 12.05(C), the introductory paragraph of section 12.05 creates an additional element required to meet the listing for mental retardation." Thomas v. Astrue, 2008 U.S. Dist. LEXIS 41150, 42 (W.D. Va. May 23, 2008). See Smith v. Barnhart, 2005 U.S. Dist. LEXIS 5975, 10 (W.D. Va. Apr. 8, 2005) (citing Barnes v. Barnhart, 116 Fed. Appx. 934, 2004 WL 2681465, 4 (10th Cir. 2004)). "The capsule definition makes it clear that mental retardation is a life-long, and not acquired, disability. Thus, to qualify as disabled under this listing, a plaintiff must first demonstrate that he has had deficits in adaptive functioning that began during childhood." Smith at 10.

The ALJ indicates that his decision was based, in part, upon the fact that Claimant was unable to produce an IQ score between 60 and 70 prior to his turning 22. Specifically, the ALJ states that the Claimant has "not established his burden of showing IQ scores from 60 through 70 prior to age 22." (Tr. 392). This is a misstatement of the law and an inaccurate characterization of Claimant's burden. To impose such a harsh burden would be to preclude nearly every potential claimant from ever satisfying the requirements of § 12.05. The Rules and Regulations clearly indicate that it was never intended for § 12.05 to require intelligence testing prior to the end of the developmental period:

> We did not intend for the second paragraph of proposed listing 12.05 to require intelligence testing (or other contemporary evidence) prior to age 18, but we believe that the proposed listing could be misinterpreted, even though it was the same as in the prior rules. The proposed listing, as in the prior rules, stated

> that the significantly subaverage general intellectual functioning with deficits in adaptive behavior must have been initially "manifested" during the developmental period. We have always interpreted this word to include the common clinical practice of inferring a diagnosis of mental retardation when the longitudinal history and evidence of current functioning demonstrate that the impairment existed before the end of the developmental period. Nevertheless, we also can see that the rule was ambiguous. Therefore, we expanded the phrase setting out the age limit to read: "i.e., the evidence demonstrates or supports the onset of the impairment before age 22."

Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50772 (Aug. 21, 2000) (to be codified at 20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 12.05).

The Court is unable to determine whether Claimant's impairment meets the capsule definition set forth in § 12.05 because of the ALJ's misinterpretation of the age 22 requirement. Therefore, the Undersigned recommends that the case be remanded with instructions to the ALJ to properly determine whether Claimant has met the age 22 requirement outlined in § 12.05.

2.      IQ Evidence

Claimant's brief alleges the ALJ erred in finding that Claimant does not meeting Listing 12.05(C). While the ALJ mentions § 12.05(C) in his decision, it appears to the Undersigned that the ALJ was actually addressing the capsule definition outlined in § 12.05. Because the ALJ determined that Claimant did not meet the age 22 requirement of § 12.05, his analysis failed to specifically address the first prong of § 12.05(C), which is whether a valid verbal, performance, or full scale IQ of 60-70 is present. The ALJ merely glossed over Claimant's IQ testing results because none of the tests were administered prior to age 22. As was stated above, § 12.05(C) requires only that a Claimant show valid IQ scores of 60 through 70 to meet the listing; it need not be shown that the scores are from a test administered prior to Claimant reaching age 22.

42

Claimant underwent three separate psychological evaluations. In March 2001, Morgan Morgan, M.A., psychologically evaluated Claimant. The testing revealed Claimant's Verbal IQ measured at 69, his Performance IQ was 79, and his Full-Scale score was 72. Mr. Morgan opined that the evaluation "does not appear internally valid, and external factors indicate that the Claimant's functioning is likely to be near the average range of intelligence." (Tr. 306).

In June 2002, Candace Gardner Wright, M. Ed. conducted a psychological evaluation of Claimant. Claimant's Verbal IQ was measured at 76, his Performance IQ was 77, and his Full-Scale score was 68. Ms. Wright believed these results to be a "low estimate of Claimant's true intellectual potential" and that Claimant's "general cognitive ability is in the Borderline range of intellectual functioning." (Tr. 615).

Finally, in July 2004, Claimant was evaluated by Brenda Hinkle, M.A., a Supervised Psychologist under the direction of Robert J. Klein, Ed.D. Claimant's Verbal IQ was measured at 70, his Performance IQ was 72, and his Full-Scale IQ was 68. Ms. Hinkle found these scores to be valid and diagnosed Claimant with Mild Mental Retardation (provisional). (Tr. 575).

Although the applicable regulations direct our inquiry to the lowest of the IQ scores, the evidence in the record cast doubt on the validity of Claimant's Full Scale IQ of 68 from both the 2002 and the 2004 psychological testing, as well as the Verbal IQ of 69 from the 2001 psychological testing. Both the 2001 and 2002 testing results were deemed invalid by the treating medical professionals. (Tr. 303 and 613). And while Ms. Hinkle diagnosed Claimant with Mild Mental Retardation, this diagnosis was *provisional*; meaning there were no psychological evaluations indicating onset of the impairment prior to age 18. The ALJ, while not specifically addressing this test, apparently deemed it to be invalid based upon Dr. Reid's

43

testimony that substance abuse can cause a decrease in scores. (Tr. 424).

The ALJ only considered this psychological evidence in concluding that Claimant did not meet the age 22 requirement of § 12.05. The ALJ discounted the results of the intelligence tests on the basis of Mr. Morgan's and Ms. Wright's finding that the scores were invalid and that Claimant's functioning is likely "near the average range of intelligence." (Tr. 392). The ALJ also based his decision on testimony from Dr. Reid that the Claimant's "long history of alcohol abuse could have decreased his IQ scores." (Tr. 392).

As was noted above, it is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. The court cannot substitute its own opinion for that of the Commissioner. With regard to Ms. Hinkle's opinion, the text of § 12.05(C) requires an IQ score to be "valid." "The regulations do not limit the question of validity to test results alone in isolation from other factors." Brown v. Secretary of Health & Human Servs., 948 F.2d 268, 270 (6th Cir. 1991). Therefore, if there is substantial evidence in the record to support his conclusion, the ALJ may discount an IQ score as invalid for a variety of reasons. See, e.g., Muse v. Sullivan, 925 F.2d 785, 788-790 (5th Cir. 1991); Popp v. Heckler, 779 F.2d 1497, 1499-1500 (11th Cir. 1986).

Therefore, the Undersigned recommends on remand that, should the ALJ find that Claimant meets the age 22 requirement, specifically address the evidence that Claimant was enrolled in regular classes, not special education classes, throughout school, reads at an eighth grade level, participated in organized sports and graduated high school. It is also imperative that the ALJ address Dr. Reid's testimony that an IQ of 68 is not consistent with an individual who reads at an eighth grade level and that there is no doubt that substantial substance abuse over a

period of time can reduce one's IQ scores in determining whether Claimant meets the first prong of § 12.05(C).

3.    Medical Expert Testimony

Claimant also contends that the ALJ erred by discounting Dr. Reid's testimony that § 12.05(C) is a "toss-up."  (Tr. 427).  Dr. Reid initially testified that it was his opinion that Claimant met 12.05(C).  (Tr. 417).  The ALJ found that Dr. Reid's "toss-up" testimony was due to counsel's "badgering" of the witness.  (Tr. 392).  While this Court cannot agree with the ALJ's characterizing counsel's questioning as "badgering," as was noted above, it is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence.  Hays, 907 F.2d at 1456.  It is the Claimant who bears the burden of showing that he has an impairment.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler, 461 U.S. at 460.  Here, the medical expert's testimony that § 12.05(C) was a "toss-up" provided little guidance to the ALJ in his determination that § 12.05(C) was not met.  Therefore, the ALJ had no choice but to base his determination on Claimant's school records and substance abuse history.  (Tr. 392).  The Claimant stated in his brief that "the simple existence of questions does not constitute 'badgering' and does not render the medical expert's opinion that there is a legitimate argument for meeting Listing 12.05C invalid."  (Pl. Br. 6).  The Undersigned agrees with Claimant that the medical expert's opinion that there is a legitimate argument for meeting Listing 12.05(C) should not be invalidated. However, the ALJ gives no indication that he found the medical expert's testimony to be invalid. He simply could not rely on this "toss-up" testimony when making his decision.  Furthermore, once the medical expert has testified that there is at least a "legitimate argument" for meeting § 12.05(C), it is Claimant's burden to make this argument.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be DENIED and this action be remanded to the ALJ to determine:  1)  Whether any of claimant's three I.Q. tests were valid and if so, why, and if not, why not; 2) Whether any valid IQ test of Claimant taken after age 22, and other evidence of record, demonstrate or support the onset of the impairment before age 22; and 3) If the ALJ finds the onset of the impairment before age 22, then whether claimant met listing 12.05(C) and if so, why, and if not, why not.

2.      Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED:  August 21, 2008

/s/ James E. Seibert

JAMES E. SEIBERT

UNITED STATES MAGISTRATE JUDGE